IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

FEDERICA FACCHETTI,         )
                                    )
      Plaintiff,          )
                                    )    Civil Action No. 5:15-cv-00049
v.                                )
                                    )    By: Elizabeth K. Dillon
BRIDGEWATER COLLEGE, *et al.*,    )        United States District Judge
                                    )
      Defendants.       )

**MEMORANDUM OPINION**

In this action, plaintiff Federica Facchetti asserts claims against Bridgewater College, the college she attended for one year as a foreign exchange student; several of its employees; and a fellow student who sexually assaulted her in her on-campus dorm room after she allowed him to stay there while she slept. The case was originally filed in the Southern District of New York, and that court transferred it upon defendants' motion.

This opinion addresses two pending motions. The first is a motion to dismiss filed collectively by Bridgewater College and the employee defendants. (Dkt. No. 72.) The second is Facchetti's "cross-motion" for leave to file an amended complaint. (Dkt. No. 80.) The motions have been fully briefed and were argued before the court on November 16, 2015. For the reasons set forth below, the motion to dismiss will be granted, and Facchetti's motion for leave to file an amended complaint will be granted in part and denied in part.

## I. BACKGROUND

The facts below are based on Facchetti's complaint and, where applicable, her proposed amended complaint, because the court accepts the well-pleaded, nonconclusory factual allegations in the complaint as true when ruling on a motion to dismiss. *Aziz v. Alcolac, Inc.*,

658 F.3d 388, 391 (4th Cir. 2011); *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).

Facchetti's claims stem from a February 5, 2014 incident in which a fellow student, defendant

Tyler Vest, sexually assaulted her. At the time of the assault, Facchetti, who is from Italy, was a

foreign exchange student at Bridgewater. According to the complaint, the assault occurred in

Facchetti's on-campus dormitory at Bridgewater, after she had invited Vest, whom she met in the

fall of 2013, to join her there.

After Vest arrived and the two talked for a while, she told him she was tired and needed

to go to sleep. She apparently did so, and it is not clear whether Vest was also sleeping in her

bed or just present in the room while she slept. Facchetti alleges that, at about 1:00 a.m., Vest

became sexually aroused and was physically and sexually aggressive toward her. Both remained

fully clothed during the assault, but Vest began fondling Facchetti's breasts, genitals, and

buttocks. She immediately instructed him to stop. Despite her instructions, he continued to act

in a sexually aggressive way and, at one point, grabbed her arms and attempted to force her to

touch his penis. Facchetti made attempts to get away from Vest, but he continued to engage in

the aggressive behavior by forcing her to lie down on her bed while he lay on top of her in an

attempt to engage in sexual intercourse. He held her down by pinning her arms to the bed,

straddling on top of her. She told him she could not breathe, but he just laughed. (Compl.

¶¶ 29–32, Dkt. No. 1.)

After several minutes, he got up, but then became angry with her because she would not

engage in sexual activity with him. He said that she was annoying him and that "he came to her

room for nothing." Shortly thereafter, he began rubbing her leg and touching her vaginal area,

and she again instructed him to stop touching her. He finally stopped, saying "If you want me to

stay here, you have to give me a blow job." When she refused, he left. (*Id.* ¶¶ 33–34.)

Facchetti first reported the assault to the Bridgewater Campus Police in early May 2014, after receiving several months of counseling.[1] (*Id.* ¶¶ 37–38.) Within days of her report, the Chief of Campus Police, defendant Nicholas Picerno, interviewed Vest. Vest corroborated the assault, admitting that he had touched Facchetti's vagina, breasts, and buttocks; tried to force her to touch his penis; and forced himself on top of her. He also admitted that Facchetti had told him to stop and that he was angry with her because she would not engage in sexual activity with him. (*Id.* ¶ 39.) According to the complaint, Bridgewater thereafter suspended Vest for a "short period of time," but later allowed him to return. (*Id.* ¶ 48(r).)

Despite this discipline, Facchetti claims Bridgewater's response constituted deliberate indifference and that Bridgewater tried to conceal the assault against her or "sweep it under the rug." For support, Facchetti focuses on Bridgewater's investigative and disciplinary processes, pointing to a number of ways in which Bridgewater did not follow its own sexual misconduct policy. (*Id.* ¶¶ 46–49.) Most of the acts and omissions she attributes either to Picerno or Crystal Lynn, Bridgewater's Title IX coordinator. In general terms, Facchetti claims that Bridgewater failed to: (1) conduct a full investigation; (2) allow her to review submissions by Vest; (3) provide written notification of the determination of administrative review; and (4) distribute a written decision letter to her after the hearing, thereby making it impossible for her to appeal any decision. She also claims that she was not advised of her right to submit additional information in advance of the hearing, was not permitted to be present during the hearing, was not permitted to respond to any testimony regarding any alleged sexual or romantic history between her and Vest as set forth in the policy, and was not permitted to present witnesses. (*Id.*)

---

[1] Facchetti's complaint refers to the fact that she sought counseling services from Bridgewater "to assist in dealing with the sexual assault" (Compl. ¶ 37), but she does not allege that her counselor should have taken any action to report the assault to anyone else at the college. Nor does she allege that anyone at Bridgewater with the authority to take any action had knowledge of the assault before early May.

Facchetti further alleges that Lynn and Bridgewater failed to make her aware of her Title IX rights, including the possibility of changes in housing or academic and extracurricular activities, and her right to report a crime to campus or local law enforcement. (*Id.* ¶ 48(c).) She complains that, despite Vest's admission that he sexually assaulted her, Bridgewater itself "failed to properly report the sexual assault" to the town police and other appropriate government agencies and entities. And she claims that she was discouraged from making any report to the town police by the campus police and Picerno. (*Id.* ¶ 48(e).) She also alleges that the hearing officers were not properly trained and that the hearing panel included two students, which she deems "outrageous." (*Id.* ¶ 48(q).) Finally, she complains that the discipline imposed on Vest was insufficient, and that allowing Vest to later return to Bridgewater "placed its students in imminent danger and inhibited their ability to obtain the benefits of the education to which they are entitled under Title IX." (*Id.* ¶ 45(r).)

Facchetti also relies heavily on her allegation that Bridgewater's public records show that there were five sexual assaults in on-campus dorms in 2013. She does not offer any additional detail about those assaults or Bridgewater's response to them. But she submits that Bridgewater's deliberate indifference to those attacks made her more vulnerable to the attack here. Based on this, she seeks to hold Bridgewater liable for the attack on her. (*Id.* ¶¶ 25–26, 47, 74.)

Facchetti was supposed to be at Bridgewater for only one year. (*Id.* ¶ 19.) That year ended shortly after she made her report and—consistent with her plans—she apparently did not return thereafter. She claims that she suffered physical injuries (bruising and shortness of breath)

during the assault, and that she continues to experience severe emotional harm as a result of the incident.[2]

Facchetti's original complaint contains the following counts and claims:

- Count I—a claim against Bridgewater and four individual defendants (Picerno, Lynn, and two others) under Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. § 1681(a),[3] which prohibits certain educational institutions from discriminating in specific ways "on the basis of sex";

- Count II—an assault claim against Vest;

- Count III—an intentional infliction of emotional distress claim against Vest;

- Count IV—a negligent infliction of emotional distress claim against Vest; and

- Count V—a premises liability claim against Bridgewater.

(*See generally* Compl.)

In her proposed amended complaint, Facchetti seeks to: (1) add claims of intentional infliction of emotional distress against Picerno and Lynn; (2) include additional detail concerning her injuries; and (3) amend her Title IX claim so that it is asserted only against Bridgewater. (Pl.'s Mot. for Leave to Amend 3, Dkt. No. 81; Proposed First Am. Compl., Dkt. No. 81-1.)

The pending motion to dismiss seeks dismissal on behalf of Bridgewater and its employee defendants, pursuant to Federal Rule of Civil Procedure 12(b)(6).[4] As noted, Facchetti

---

[2] Facchetti's declaration, which the court is not considering (*see* Section II.B. *infra*), also states that she was harassed by Vest after the incident. (Decl. ¶ 22, Dkt. No. 73-2 ("After the Incident, Vest would not leave me alone and I experienced psychological violence from him.").) A similar allegation is contained in the proposed amended complaint: "After the assault, Vest would not leave the Plaintiff alone and he intimidated her." (Proposed First Am. Compl. ¶ 117, Dkt. No. 81-1.) Even if the court considered that allegation, her Title IX claim would still be subject to dismissal. Notably, she fails to specify the time-frame of the supposed "intimidation." Moreover, there is no allegation that Facchetti ever reported that additional harassment to Bridgewater. *See also* note 8 *infra*.

[3] The statute provides that, with certain exceptions not relevant here, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a).

[4] Vest filed an Answer while the case was still pending in New York, but has not filed a motion to dismiss.

agrees to the dismissal of the Title IX claims against the individual defendants (and her proposed amended complaint does not contain those claims), so that relief will be granted by agreement of the parties. Bridgewater also argues that the Title IX claim and premises liability claim against it are both subject to dismissal because they fail to state a claim.

As to Facchetti's motion for leave to file an amended complaint, defendants oppose her attempt to add claims of intentional infliction of emotional distress against Lynn and Picerno. (Defs.' Mem. in Opp'n to Pl.'s Mot. for Leave to Amend 1, Dkt. No. 83.) Despite arguing that the motion for leave should be denied, Bridgewater does not specifically oppose the other proposed changes to the complaint. As described by Facchetti, those changes: remove references to the individual defendants who are no longer named in the Title IX count; include "a revised, updated list of injuries sustained by plaintiff"; make non-substantive changes to certain paragraphs; and alter the jurisdiction and venue allegations. (Pl.'s Br. Supp. Mot. for Leave to Amend 1 & n.1, Dkt. No. 81.)

## II. DISCUSSION

### A. Rule 12(b)(6) Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff's allegations must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This standard "requires the plaintiff to articulate facts, when accepted as true, that 'show' that the plaintiff has stated a claim entitling him to relief, *i.e.*, the 'plausibility of entitlement to relief.'" *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678). The plausibility standard requires more than "a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.

In determining whether the plaintiff has met this plausibility standard, the court must accept as true all well-pleaded facts in the complaint and in any documents incorporated into or attached to the complaint. *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). Further, it must "draw[] all reasonable factual inferences from those facts in the plaintiff's favor," *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999), but it need not "accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *Giarratano*, 521 F.3d at 302.

**B.      The Court Will Not Consider Any Documents Other than the Complaint and Proposed Amended Complaint in Ruling on the Motion to Dismiss.**

Before turning to the merits of the motion to dismiss, the court must first determine which documents and other extrinsic materials, if any, it may consider in ruling on the motion. At this stage, a court should generally focus its "inquiry on the sufficiency of the facts relied upon by the plaintiff[] in the complaint." *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015). Thus, a court is "limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Id.* (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011)). If a court goes beyond these documents during the pleading stage, then it "improperly converts the motion to dismiss into a motion for summary judgment." *Zak*, 780 F.3d at 606. "Such conversion is not appropriate where the parties have not had an opportunity for reasonable discovery." *Kolon,* 637 F.3d at 448.

There are exceptions to this general rule, however. For example, the court may consider a document outside the complaint, without converting the motion into a summary judgment motion, if the document "was integral to and explicitly relied on in the complaint," and there is

no challenge to its authenticity. *Id.* at 448 (quoting *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)); *see also Sec'y of State for Defence*, 484 F.3d at 705.

The parties urge the court to consider specific, albeit different, documents that are attached to the motion to dismiss, none of which are part of, or incorporated by reference into, the complaint or the proposed amended complaint. The parties nonetheless contend that the court can consider those documents without converting the motion into one for summary judgment.

During the hearing, the court asked counsel to clarify the parties' respective positions as to which documents the court could consider. Bridgewater's counsel argued that the only extrinsic document the court should consider is a document that Facchetti filed as part of her opposition to the motion to dismiss. (Defs.' Mot. to Dismiss Ex. C, Dkt. No. 73-3.) Facchetti's counsel argued that the only document the court should consider is Facchetti's declaration.[5] (Defs.' Mot. to Dismiss Ex. B, Dkt. No. 73-2.) Also at issue is the determination letter sent to Vest, which explains Bridgewater's decision regarding Facchetti's allegations, and outlines both his punishment and the various steps he must take to be eligible to apply for readmission. (Defs.' Mot. to Dismiss Ex. D, Dkt. No. 73-4.)

The court has carefully weighed the propriety of considering these documents and concludes that it will not consider any of them, particularly in the absence of any agreement by the parties that it is proper to do so. There are two main reasons for the court's decision. First, it is unclear whether any of the documents squarely meets the requirements for consideration at the

---

[5] There are two declarations from Facchetti in the record. The first, dated February 16, 2015, was submitted in opposition to the original motion to dismiss, filed while the case was pending in New York, and defendants here submitted it again as an exhibit. (Defs.' Mot. to Dismiss Ex. B, Dkt. No. 73-2.) The second, also dated February 16, 2015, was submitted in support of Facchetti's motion for leave to file an amended complaint. (Dkt. No. 81-2.) They are substantively identical.

motion-to-dismiss stage. Second, regardless of whether the court considers all, some, or none of the documents, its ruling would remain the same. Accordingly, the court will err, if at all, on the side of being underinclusive.[6]

## C. Facchetti's Allegations, Including Those in Her Proposed Amended Complaint, Are Insufficient to State a Title IX Claim Against Bridgewater.

The court turns next to Bridgewater's motion to dismiss the Title IX claim. To recover damages under Title IX in a case of peer-on-peer harassment, the plaintiff must show that "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures . . . has actual knowledge of discrimination and fails to adequately respond." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998); *see also Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 671 (1999) (applying the *Gebser* standard in the context of student-on-student harassment).

In addition to the actual notice requirement, a Title IX plaintiff must show that the defendant's response to the third-party harassment was so inadequate as to constitute "deliberate indifference"; mere negligence is insufficient. *Gebser*, 524 U.S. at 290; *see also Davis*, 526 U.S. at 642 (holding that a school district is liable under Title IX "only where the district itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of . . . harassment of which it had actual knowledge"). Further, an institution is deliberately indifferent "only where [its] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. Significantly, Title IX does not

---

[6] Because the court is granting the motion to dismiss and because Facchetti has urged consideration of her declaration, the court briefly discusses why consideration of the declaration would not change the result here. First, many of the allegations in the declaration are already contained in the complaint or the proposed amended complaint. Further, almost all of the additional information in the declaration serves to highlight the damages that Facchetti has endured as a result of defendants' alleged actions. Since the court's decision does not rest, in whole or in part, on any lack of damages, those additional allegations do not affect it.

require that an institution "remedy" peer harassment, but simply that it "respond to known peer harassment in a manner that is not clearly unreasonable." *Id.* at 648–49.

The Supreme Court made clear in *Davis* that Title IX liability is limited to circumstances where the school "exercises substantial control over both the harasser and the context in which the known harassment occurs." *Id.* at 645. In other words, "[a] recipient cannot be directly liable for its indifference where it lacks the authority to take remedial action." *Id.* at 644. Further, "the deliberate indifference must, at a minimum 'cause [the plaintiff] to undergo' harassment or 'make [her] liable or vulnerable' to it." *Id.* at 644–45 (citations omitted).

The *Davis* court also expressly recognized that deliberate indifference could be decided on a motion to dismiss. *Id.* at 649 ("In an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not 'clearly unreasonable' as a matter of law."). As discussed next, the court concludes that this is an appropriate case where the court can say, as a matter of law, that the response was "not 'clearly unreasonable.'" *See id.*

**1. Bridgewater was not deliberately indifferent after Facchetti reported the assault.**

In its motion to dismiss, Bridgewater focuses almost exclusively on its conduct after Facchetti reported the assault, so the court addresses that period first. As alleged in the complaint, Facchetti reported the assault to campus police in early May, and within days, campus police had interviewed Vest. After Bridgewater officers obtained Vest's confession, Bridgewater "suspended [Vest] for a short period of time." (Compl. ¶ 48(r).) While Facchetti complains that Bridgewater did not follow its own policy, and that she was not kept advised about the hearing that was held, or given written notice of the discipline against Vest, she admits that her complaint was not ignored and that Bridgewater quickly interviewed Vest, held a

hearing, and took disciplinary action against him. This conduct by Bridgewater simply does not amount to "deliberate indifference."

Even in her response to the motion to dismiss, Facchetti repeatedly questions whether the college's response was reasonable or proper, but that is not the correct standard. Instead, Bridgewater's response must have been "clearly unreasonable" to trigger liability. Facchetti emphasizes that Bridgewater—and Picerno and Lynn, in particular—discouraged her from reporting the assault to the police, failed to advise her of the rights available to her, and failed to allow her to present witnesses, and to otherwise keep her involved and advised of the disciplinary process, all in violation of its own Title IX policy. She also argues that the disciplinary sanction imposed was not sufficient.[7] Under the cases interpreting Title IX, however, none of these facts provides a basis for finding that Bridgewater was deliberately indifferent.

First, a Title IX defendant's failure to comply with its own policy does not prove deliberate indifference, under clear Supreme Court precedent. *Gebser*, 524 U.S. at 291–92; *Doe v. Bd. of Educ. of Prince George's Cty.*, 982 F. Supp. 2d 641, 657 (D. Md. 2013) (citing *Gebser* for the proposition that "the failure to follow sexual harassment grievance procedures does not prove deliberate indifference under Title IX"). Moreover, any contention that Bridgewater tried to minimize the conduct or to sweep it under the rug is a mere conclusory label, particularly where the complaint also alleges that, upon receiving her complaint, an investigation occurred, a hearing was held, and Vest was suspended.

---

[7] In her declaration, but not in her proposed amended complaint, Facchetti acknowledges Vest's one-semester suspension, but also claims that it was not serious relative to sanctions imposed by Bridgewater in other cases. (Decl. ¶ 25, Dkt. No. 73-2.) She specifically references another incident in which a student was expelled after breaking another student's arm. (*Id.*) She claims that the disparity shows Bridgewater did not take seriously Vest's assault. Again, though, the court does not consider her declaration, nor does it consider the notice of decision sent to Vest outlining his discipline.

Second, there is ample authority holding that neither a school's negligence in addressing a sexual assault, nor its failure to provide the remedy wanted by the victim, constitutes deliberate indifference under Title IX. *See, e.g., KF v. Monroe Woodbury Cent. Sch. Dist.*, 531 F. App'x 132, 134 (2d Cir. 2013) (concluding that a school was not deliberately indifferent when it refused to allow a high school student to transfer to another district—the remedy the parents sought— where it offered placement at a behavioral-problem high school once it learned of prior abuse and there was "no charge that the school unreasonably delayed its response or failed to prevent future harassment"); *Ostrander v. Duggan*, 341 F.3d 745, 751 (8th Cir. 2003) (holding that, after female student reported to university that she was drugged and raped by a member of a fraternity, the university's decision not to impose sanctions on the fraternity was not "clearly unreasonable" where it informed the chapter advisor of the report and wrote to the fraternity's national president, conveying the "expectation" that the local chapter of the fraternity would investigate); *Doe*, 982 F. Supp. 2d at 657–58 (noting that Title IX plaintiffs lack the "right to make particular remedial demands" (citing *Davis* 526 U.S. at 648)), *aff'd* 605 F. App'x 159 (4th Cir. 2014); *Schaefer v. Las Cruces Public Sch. Dist.,* 716 F. Supp. 2d 1052, 1069 (D.N.M. 2010) (dismissing Title IX claim based on lack of deliberate indifference because the school's response, even if negligent, was not "clearly unreasonable" and reasoning that liability cannot attach where the defendant "responds to reports of student-on-student sexual harassment, but simply does not do enough to stop the problem").

Further, Facchetti's allegations of deliberate indifference pale in comparison to other cases where a plaintiff's Title IX claim has survived dismissal or summary judgment. Most often, those cases involved allegations of complete inaction in the face of known harassment. *See, e.g.*, *Jennings v. Univ. of N.C.*, 482 F.3d 686, 701 (4th Cir. 2007) (en banc) (holding that

deliberate indifference was a jury issue where the evidence showed that a university administrator's response to a student's detailed complaint of extensive and pervasive sexual harassment by her soccer coach was to tell the student the coach was a "great guy" and that she should "work out her problems directly with him," and where the harassment continued afterward); *Rex v. W. Va. Sch. of Osteopathic Med.*, 119 F. Supp. 3d 542, 551 (S.D. W. Va. 2015) (denying motion to dismiss Title IX claim of student who was drugged and raped by fellow students, where she alleged that she was harassed by attacker, other students, and staff as she pursued her claim; that there were no procedures in place for her to get support; and that the school "engaged in the investigation with the intention of minimizing the incident [and] protecting the school's reputation, all of which could constitute deliberate indifference"). Here, although Facchetti alleges in conclusory fashion that Bridgewater attempted to protect the school's reputation and sweep the incident under the rug, she also alleges that Bridgewater interviewed Vest immediately, received his confession, and took action against him, including a suspension.

In light of the facts alleged, the discipline imposed, even if negligent, was not "clearly unreasonable." Thus, deliberate indifference is not adequately pleaded as to the period after Facchetti was assaulted.[8]

---

[8] As the court explained in note 2 *supra*, Facchetti seeks to amend her complaint to allege that "[a]fter the assault, Vest would not leave [her] alone and he intimidated her." (Proposed First Am. Compl. ¶ 117, Dkt. No. 81-1.) She does not allege, however, that she told anyone at Bridgewater about this. She also fails to identify whether this intimidation occurred before she reported the assault in May 2014, afterward, or both. In any event, if it happened before she reported the assault—*i.e.*, between February 5, 2014, and early May 2014—then it cannot be the result of Bridgewater's alleged deliberate indifference since Bridgewater did not have actual notice of it. If the intimidation occurred after she complained and before she left at the end of the academic year, it still is not sufficient to allege deliberate indifference—at most, it shows negligence. The court's conclusion is consistent with the above-cited cases that hold that, even where the remedial action taken is ineffective in stopping the harassment, that does not show deliberate indifference.

2.  **The five 2013 assaults and Bridgewater's lack of response to them is insufficient to support Facchetti's allegation that Bridgewater was deliberately indifferent toward her.**

In her response to the motion to dismiss, Facchetti contends that "the rampant, prior sexual assaults occurring on its campus of which Bridgewater was fully aware made plaintiff more vulnerable to being sexually assaulted by Vest." (Pl.'s Opp'n to Mot. to Dismiss 17, Dkt. No. 79; *see also id.* at 18 (referring to Bridgewater's knowledge of "the epidemic of sexual assaults occurring in its on-campus housing" and its "ability to attempt to remedy such heinous acts but fail[ure] to do so.") She thus relies on Bridgewater's alleged deliberate indifference to the prior attacks to establish her Title IX claim. (*Id.* at 13–14 (citing *Lopez v. Metro. Gov't*, 646 F. Supp. 2d 891, 917-18 (M.D. Tenn. 2009), as recognizing that Title IX liability can flow from a school exhibiting deliberate indifference before a harassing attack that makes the student more vulnerable to the attack itself).)

Facchetti cites to a number of cases for the proposition that prior harassing conduct need not be "plaintiff specific" or involve the same perpetrator that assaulted the plaintiff for a university's deliberate indifference to prior complaints to result in Title IX liability. (Dkt. No. 79 at 17–18.) In the Fourth Circuit, though, there is a requirement that the defendant have actual notice of harassment against the plaintiff. Specifically, in *Baynard v. Malone*, 268 F.3d 228, 237–38 (4th Cir. 2001), the court noted that the school's principal should have been aware of the potential for abuse by the teacher because the principal had received information before the abuse that the teacher had molested another male student years earlier. The court concluded, however, that the school could not be held liable because there was no evidence that the principal was actually aware that the student-plaintiff was being abused. *Id.*; *see also Rasnick v. Dickenson Cty. Sch. Bd.*, 333 F. Supp. 2d 560, 566 (W.D. Va. 2004) (granting summary

judgment for defendant on Title IX claim because court was bound to do so by *Baynard* where the plaintiff failed to establish "actual notice," despite knowledge that the same teacher had engaged in instances of inappropriate behavior in prior school years); *Ray v. Bowers*, 767 F. Supp. 2d 575, 581 (D.S.C. 2009) (granting summary judgment for college on Title IX claim despite the college's knowledge of prior complaints against a harassing professor, because *Baynard* required the plaintiff to show that the college had knowledge of harassment by the professor against the plaintiff, and it did not have such notice until the plaintiff reported him); *Johnson v. Galen Health Insts., Inc.*, 267 F. Supp. 2d 679, 687–88 (W.D. Ky. 2003) (noting that, while some district courts in the Sixth Circuit have held that the notice need not be plaintiff-specific, the Fourth Circuit has required "a showing that school district officials possessed actual knowledge of the discriminatory conduct in question"). *But see Rasnick*, 333 F. Supp. 2d at 566 (noting that, if the court were not bound by *Baynard*, it would adopt the view embraced by the majority of courts that "actual notice includes knowledge indicating a substantial risk or likelihood of harm," but that it could not "distinguish [*Baynard*] in any principled way").

Facchetti does not cite to *Baynard* in her papers, let alone attempt to distinguish it. Instead, she cites to a number of cases from other circuits that either: (1) conclude that notice of prior harassment by the same perpetrator was sufficient notice, *see, e.g.*, *Roe v. Gustine Unified Sch. Distr.*, 678 F. Supp. 2d 1008, 1030 (E.D. Cal. 2009) (collecting cases); or (2) adopt an even broader test, allowing "actual knowledge" of the harassment to be based on knowledge of similar types of harassment, even if the past harassment was not committed by the same perpetrator or against the same plaintiff, *see, e.g.*, *Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1170, 1173,

1177 (10th Cir. 2007);[9] *Mathis v. Wayne Cty. Bd. of Educ.*, 782 F. Supp. 2d 542, 549 (M.D. Tenn. 2011) (adopting the standard of notice that requires only that the institution "possessed enough knowledge of the harassment that it reasonably could have responded with remedial measures to address the kind of harassment upon which the plaintiff's legal claim is based" and rejecting one that requires knowledge of harassment by a particular perpetrator or against a particular individual). This court, however, is bound to follow *Baynard*.

Under the more stringent test of *Baynard*, the notice here is plainly insufficient to impose liability on Bridgewater. There is no allegation that Facchetti was previously assaulted by Vest and, indeed, no allegation that Vest committed any prior assault against anyone. The fact that there were five other sexual assaults in campus dorms in the preceding year is simply too tenuous to satisfy the "actual notice" requirement under clear Fourth Circuit precedent.

For all of these reasons, the court will dismiss Facchetti's Title IX claim against Bridgewater.[10]

## D.    Facchetti Does Not State a Plausible Claim for Premises Liability Against Bridgewater.

Bridgewater also moves to dismiss the premises liability claim against it. A premises liability claim is a species of negligence claim, and thus "the factual allegations must establish the existence of a duty of care." *Yuzefovsky v. St. John's Wood Apts.*, 540 S.E.2d 134, 139 (Va.

---

[9] The court includes the citation to *Simpson* because Facchetti relies on it, but a careful reading of *Simpson* shows that it is inapposite. There, the court concluded that the notice standards established in *Gebser* and *Davis*, and applicable generally in the student-on-student harassment context, did not apply in the case before it, which was akin to a civil rights claim based on an "official custom or policy." 500 F.3d at 1174–75, 1177. In *Simpson*, the "gist of the complaint" was that the university sanctioned, supported, even funded, a program (showing [football] recruits a 'good time') that, without proper control, would encourage" harassment. *Id.* at 1177. In that context, the court held that summary judgment was erroneously granted for the university where there were facts reflecting extensive knowledge of university officials as to prior rapes and harassment in the context of the recruiting program, even though those prior acts were not committed against the same plaintiffs or by the same perpetrators.

[10] Even considering the additional allegations in the proposed amended complaint, the Title IX claim against Bridgewater is subject to dismissal for the same reasons.

2001). "Whether such duty exists is 'a pure question of law.'" *Id.* (quoting *Burns v. Johnson*, 458 S.E.2d 448, 451 (Va. 1995)).

Virginia strictly limits the circumstances in which a defendant has a duty to warn or protect another from the criminal acts of a third party. The general rule is that "a person does not have a duty to protect another from the conduct of third persons." *Burns v. Gagnon*, 727 S.E.2d 634, 641 (Va. 2012) (citations omitted). The rule applies with particular force "when the third person commits acts of assaultive criminal behavior because such acts cannot reasonably be foreseen." *Id.* (quoting *Burdette v. Marks*, 421 S.E.2d 419, 420 (Va. 1992)). There are exceptions to this rule, though, including where "a special relation exists . . . between the defendant and the plaintiff which gives a right to protection to the plaintiff." *Burns*, 727 S.E.2d at 641–42 (quoting *Burdette*, 421 S.E.2d at 420).

In *Commonwealth v. Peterson*, 749 S.E.2d 307 (Va. 2013), the court explained that, where a special relationship does exist, "the degree of the foreseeability of harm that the plaintiff must establish depends on the nature of the special relationship." *Id.* at 311. There "are two levels of foreseeable harm: known or reasonably foreseeable harm, . . . and 'imminent probability of harm,'" which exists where a defendant knows that criminal assaults against persons are occurring, or about to occur, on the premises," based upon "notice of a specific danger just prior to the assault." *Id.* at 312 (citing *Thompson v. Skate Am., Inc.*, 540 S.E.2d 123, 127 (2001)). The "imminent probability" standard of foreseeability is applied in relationships like landlord/tenant and business owner/invitee. *Id.* at 312. The heightened duty to warn when the danger of third party criminal acts is "known or reasonably foreseeable" is imposed in certain other special relationships, such as innkeeper/guest, carrier/passenger, and employer/employee. *Id.* at 311–12. In *Peterson*, the court assumed, without deciding, that a special relationship

existed between a university and its students, but concluded that the university had no duty to warn students from the criminal acts of a mass shooter on campus because those acts were not foreseeable under either standard. *Id.* at 313.

The parties here disagree over the nature of the special relationship, if any, between a college and its students. Bridgewater argues that its relationship with Facchetti here was akin to that of a landlord and tenant. (*See* Defs.' Br., Dkt. No. 73 at 13–15 (focusing almost entirely on landlord-tenant law, and citing to a number of Virginia cases that did not impose a duty to protect in that context).) Facchetti counters that the relationship is entitled to a higher degree of care by the college than a landlord-tenant relationship, citing a Virginia trial court decision, *Wilson v. Commonwealth*, 17 Va. Cir. 144, 145 (Va. Cir. Ct. 1989).

The *Wilson* court reasoned that the relationship between a college or university and its resident dormitory student "is not identical or perceived to be the same relationship between a landlord and tenant in the ordinary course of business" and instead that a "student living in a college dormitory should reasonably expect a greater degree of protection from [his college] than would a tenant who leases residential property from a landlord in the open market." *Id.* Notably, though, the *Wilson* court did not cite to any authority for that proposition, *id.*, nor has it been cited by any other case for that proposition, and its holding is not binding on this court. *Cf. United States v. Little*, 52 F.3d 495, 498 (4th Cir. 1995) (discussing the circumstances under which the holding of a state's intermediate appellate court must be followed by federal courts).[11]

Facchetti also seeks support in the following language from *DiGiacinto v. Rector & Visitors of George Mason University*, 704 S.E.2d 365, 370 (Va. 2011): "Parents who send their

---

[11] In any event, the facts in *Wilson* are easily distinguishable. There, a student was assaulted by an unknown man in the hallway of her dormitory. 17 Va. Cir. at 144. She had complained to security earlier that same night, and there had been no response. *Id.* Facchetti made no such complaints.

children to a university have a reasonable expectation that the university will maintain a campus free of foreseeable harm." To support this proposition, the *DiGiacinto* court cited to *Schieszler v. Ferrum College,* 236 F. Supp. 2d 602, 606–10 (W.D. Va. 2002), and *Hartman v. Bethany College,* 778 F. Supp. 286, 291 (N.D.W. Va. 1991), and the plaintiff relies on these cases as well. None of these cases, however, supports a plausible claim of premises liability against Bridgewater under the facts here.

As for the quoted statement in *DiGiacinto,* it has no bearing on the circumstances here. In that case, the Supreme Court of Virginia was not addressing whether a university could be held liable for a third party's tortious acts against a student, but whether the university could constitutionally prohibit a non-student from carrying a firearm into certain areas of campus. The quotation appears in the context of discussing the General Assembly's recognition that a university is a "sensitive place" and a setting different from "a public street or park" that has traditionally been open to the general public. *Id.* *DiGiacinto* does not speak to the issues here.

The two cases cited by *DiGiacinto*, while at least on topic, do not suggest that Bridgewater would have a duty to protect on the facts here. The first, *Hartman,* involved a 17-year-old college student who went to an off-campus bar, was drinking alcohol, and was subsequently assaulted by two men she had met at the bar. 778 F. Supp. at 289, 291. The court rejected any claim that her college breached any duties owed to the student and concluded that the college did not stand *in loco parentis* to the student. *Id.* at 294. In concluding that the college owed no duty to warn or protect the plaintiff, the court distinguished the facts before it from other cases, in which a duty was found to exist after a student was assaulted by a third party on campus grounds. *Id.* at 291. It cited to these cases from other jurisdictions—albeit none from Virginia—for the proposition that "[a] college has a general obligation to its students to maintain

a campus environment free of foreseeable harm." *Id.* Consistent with Virginia law, most of the cases cited in *Hartman* employed a foreseeability test in determining whether a duty existed— and often rejected any duty, or at least liability, where the criminal acts were not foreseeable. *See, e.g.*, *Brown v. N.C. Wesleyan Coll., Inc.*, 309 S.E.2d 701, 703 (N.C. Ct. App. 1983) (concluding that the danger of a student's being abducted and subsequently raped and murdered was not reasonably foreseeable where there were only scattered incidents of crime on the campus previously). So neither *Hartman*, nor the cases it cites, compels the conclusion that Bridgewater had a duty to protect Facchetti under the facts here.

The second case cited by the *DiGiacinto* court, *Schieszler*, discussed the precise issue of whether a special duty is owed by a college to its students under Virginia law. 236 F. Supp. 2d 602. There, after conducting a survey of Virginia and other states' laws, the court concluded that it was "*unlikely* that Virginia would conclude that a special relationship exists as a matter of law between colleges and universities and their students," but nonetheless concluded that a special relationship might exist on the particular facts alleged there. *Id.* at 609 (emphasis added).

In *Schieszler*, a full-time student, living in an on-campus dormitory, committed suicide. Prior to his suicide, the defendants were aware that the student had emotional problems, and in fact they had required him to seek anger management counseling before permitting him to return to school for a second semester. *Id.* at 605. Days prior to his death, campus police had left him alone in his room after finding him with self-inflicted bruises on his head, *id.* at 610, and knew that he had sent a message to his girlfriend, and others at the same time, stating that he intended to hang himself. *Id.* at 605. In response, the defendants had required him to sign a statement that he would not hurt himself. *Id.* The court reasoned that all of these facts could give rise to a duty to protect the student from the foreseeable danger that he would hurt himself. *Id.* at 610.

Much like the *Schieszler* court, this court is unsure whether Virginia would impose, as a matter of law, a heightened duty on a college to warn or protect its students from a third party's tortious acts on campus. But even assuming that the relationship between Bridgewater and Facchetti is akin to that of an innkeeper/guest, the duty imposed is one to protect from "known or reasonably foreseeable" risks. And Facchetti's allegations do not plausibly allege that the risk of Vest assaulting her in her dorm room was either "known" or "reasonably foreseeable" by Bridgewater. Indeed, the *Peterson* court summarized that "[i]n only rare circumstances has this Court determined that the duty to protect against harm from third party criminal acts exists" in this context, *id.* at 312, and it cited a single case—*Taboada v. Daly Seven, Inc.*, 626 S.E.2d 428 (Va. 2006).

In *Taboada*, the plaintiff was a hotel guest who was assaulted and shot in a hotel parking lot. *Id.* The Supreme Court of Virginia held that the plaintiff had stated sufficient facts to support his claim that the hotel owed a duty to protect him from the criminal conduct of a third party. *Id.* at 435. The motion for judgment in the case alleged that, nearly 100 times in the preceding three years, the hotel had called the police department to report the presence of trespassers who refused to leave and other criminal activity in the parking lot, including larcenies, disorderly persons, suspected drug offenses, robberies, malicious woundings, and shootings. *Id.* It further alleged that the hotel "was informed by the [police department] and by others that its guests were at a specific imminent risk for harm to their persons from uninvited persons coming into or upon its property" and that the hotel needed to retain uniformed security guards to guard against the risk, but that it discontinued its employment of such guards during the overnight hours to "sav[e] expenses." *Id.* at 430–31. Based on these specific allegations, the court held that enough had been pleaded for the claim to go forward.

Much like the other cases discussed above, *Taboada* does not require the imposition of a duty here, because the duty remains a duty to protect from *reasonably foreseeable* harm. Five assaults in the prior year in the dormitories of a college—even a small one, such as Bridgewater—is not the equivalent of 100 calls to the police in three years about possible criminal activity in the same parking lot. The five assaults, none of which are alleged to have been perpetrated by Vest, simply do not create the same level of foreseeability of harm. *Cf. Peterson*, 749 S.E.2d at 312 (recognizing that *Taboada* was one of the rare cases where the harm was reasonably foreseeable).

Similarly, this case is a far cry from *Schieszler*, where the college had notice of prior, recent suicide attempts *by the same student*. Again, there is no allegation that Vest had previously assaulted anyone. And so while it may be generally foreseeable—as well as unfortunate and troubling—that sexual assaults occur on college campuses, including Bridgewater's, that general risk does not translate into a "reasonably foreseeable" risk that Vest would assault Facchetti.

Further, it is unclear how Facchetti could plausibly establish causation here, particularly where she invited Vest to her room and invited him to stay while she slept. Under those circumstances, and in the absence of any allegation in the complaint that Vest had previously committed any sexual assault, it is unclear what steps the college could have taken to protect Facchetti from attack. For all of the foregoing reasons, the court concludes that Facchetti has not adequately pleaded a negligence claim against Bridgewater. Accordingly, the court will grant Bridgewater's motion to dismiss that claim.

**E.     Facchetti's Proposed Amended Complaint Does Not State a Claim for Intentional Infliction of Emotional Distress Against Picerno or Lynn.**

Defendants also argue that Facchetti's proposed amended complaint fails to state a claim for intentional infliction of emotional distress against Picerno or Lynn and that leave to amend should thus be denied.  "The court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2).  A district court may deny leave to amend, however, under certain circumstances, including where "the amendment would [be] futile." *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (en banc) (citation omitted).  A proposed amendment is futile when it "is clearly insufficient or frivolous on its face" and thus would be subject to dismissal. *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 510 (4th Cir. 1986).  Here, amendment would be futile because the claims that Facchetti proposes to add are clearly insufficient under Virginia law.

To prevail on an intentional infliction of emotional distress claim, a plaintiff must prove, by clear and convincing evidence, that: (1) "the wrongdoer's conduct is intentional or reckless," (2) "the conduct is outrageous and intolerable," (3) "the alleged wrongful conduct and emotional distress are causally connected," and (4) "the distress is severe." *Fuller v. Aliff*, 990 F. Supp. 2d 576, 580 (E.D. Va. 2013) (*citing Russo v. White*, 400 S.E.2d 160, 162 (Va. 1991)).

Furthermore, intentional infliction of emotional distress claims are not favored under Virginia law. *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 268 (4th Cir. 2001).  The *Barrett* court explained:

> A showing of severe emotional distress, as opposed to generalized emotional distress, is required because "the injuries in such cases are too hard to determine with any reasonable certainty—are more often assumed than real—and the suit too liable to be wholly speculative.  If everyone was allowed damages for injuries to his feelings caused by someone else, the chief business of mankind might be fighting each other in the courts."

> *Ruth v. Fletcher*, 377 S.E.2d 412, 415 (Va. 1989). This is why
> "such torts are 'not favored' in the law." *Id*. (quoting *Bowles v. May*, 166 S.E. 550, 555 (Va. 1932)).

240 F.3d at 269.

In evaluating Facchetti's proposed claims, the court agrees with defendants that the claims would be subject to dismissal because Facchetti does not allege conduct by Picerno or Lynn sufficient to satisfy the second element of the tort—"outrageous and intolerable" conduct. *See Crittendon v. Arai Americas, Inc.*, No. 2:13-cv-567, 2014 WL 31490, at *6 (E.D. Va. Jan. 3, 2014) (dismissing intentional infliction of emotional distress claim and noting that the second prong, requiring outrageous and intolerable conduct, "is seldom met by plaintiffs under Virginia law").

In emotional distress cases, "liability has been found only where the conduct has been so outrageous in character, and so outrageous in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Fuller*, 990 F. Supp. 2d at 580 (*quoting Russo* 400 S.E. 2d at 162); *see also Coles v. Carilion Clinic*, 894 F. Supp. 2d 783, 796–97 (W.D. Va. 2012) (holding that plaintiff's allegations failed to establish conduct sufficiently "severe and outrageous" to support an emotional distress claim, where fellow employees frequently referred to him as a drug dealer and by using the N-word, and where he was subjected to the display of shackles and a noose in the workplace, and also subjected to references to the Ku Klux Klan and lynching); *Webb v. Baxter Healthcare Corp.*, No. 94-1784, 1995 WL 352485, at *6 (4th Cir. June 13, 1995) (concluding that the plaintiff's allegations that she was repeatedly ridiculed based on her gender, religion, and disability were insufficient to state a claim for emotional distress under Virginia law).

Facchetti's allegations against both Picerno and Lynn fail to plausibly satisfy this stringent requirement. She alleges that Picerno "intentionally discouraged, dissuaded and otherwise intimidated [her] from reporting" the assault to the local Bridgewater police, that he "told her that it would be harder to go to the local police and more complex," and that he "indicated that she would have to answer personal questions about the assault and suggested that the incident would become public knowledge." (Proposed First Am. Compl., ¶ 107.) She also alleges that he should have reported the incident himself, but that he did not, and that he failed to report it in order to "conceal it from the public." (*Id.* ¶¶ 45(d)–(e), 108.) These allegations are plainly insufficient under the case law discussed above to amount to "outrageous and intolerable" conduct.

Facchetti's allegations against Lynn are similarly infirm. As alleged by Facchetti, Lynn's conduct consists of negligence and failures or omissions, rather than extremely outrageous conduct. For example, Facchetti alleges that Lynn failed to advise her of her rights and "carefully explain" those rights to her, failed to "conduct a proper, complete[,] and thorough investigation," and failed to notify Facchetti of options available to her to try to avoid contact with Vest. (Proposed First Am. Compl. ¶¶ 45(a), (c), 114–116.) These allegations simply do not rise to the level required to support an intentional infliction of emotional distress claim, and thus leave to amend to add this claim against either Picerno or Lynn will be denied as futile.

## III. CONCLUSION

For all of the foregoing reasons, the court will grant the motion to dismiss in its entirety. The court will deny the motion to amend to add new claims as futile, but will otherwise allow amendment. This will result in the dismissal of the Title IX claim against all defendants and the

premises liability claim against Bridgewater, leaving only the state law claims against Vest.[12]

An appropriate order will be entered.

      Entered: March 30, 2016.


                                  */s/ Elizabeth K. Dillon*
                                Elizabeth K. Dillon
                                United States District Judge

---

[12] The plaintiff asserts jurisdiction on the basis of diversity, pursuant to 28 U.S.C. § 1332. Therefore, the dismissal of the plaintiff's only federal claim does not require the court to consider whether to exercise its supplemental jurisdiction over the remaining claims. *Cf.* 28 U.S.C. § 1367(c).